**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------ X

MARTY V. JERNIGAN,

                      Plaintiff,

            - against -

DALTON MANAGEMENT COMPANY,
LLC, FIFTH & 106TH STREET
ASSOCIATES, INC., AND
LAKEVIEW APTS.,

                Defendants.

------------------------------------------------ X

**OPINION AND ORDER**

**10 Civ. 94 (SAS)**

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.   INTRODUCTION

       Marty V. Jernigan brings suit against his former employers, Dalton

Management Company, LLC ("Dalton") and Fifth & 106th Street Associates, Inc.

("Associates") (together, "Defendants"), alleging employment discrimination on

the basis of disability in violation of the Americans with Disabilities Act

("ADA"),[1] New York State Human Rights Law ("NYSHRL"),[2] and New York

---

    [1]     *See* 42 U.S.C § 12101 *et seq.*

    [2]     *See* N.Y. Exec. Law § 290 *et seq.*

City Human Rights Laws ("NYCHRL").[3]  Defendants now move for summary

judgment to dismiss the Complaint in its entirety, arguing Jernigan is not a

"qualified individual" under the ADA, NYSHRL, or NYCHRL; or, alternatively,

Defendants move to limit the damages available at trial.  For the following reasons,

Defendants' motion is denied in part and granted in part.

## II.   BACKGROUND

Jernigan was employed as a superintendent for the Lakeview

Apartments ("Lakeview") from December 1996 until October 21, 2008.[4]  At all

relevant times, Associates owned the Lakeview,[5] and beginning in 2001, Dalton

was the managing agent.[6]  Plaintiff was a member of the Service Employees

International Union, Local 32BJ (the "Union"), which represents, among others,

superintendents, handymen, and porters at residential and commercial facilities in

New York City.[7]

The parties dispute the scope and essential functions of a

---

[3]   *See* N.Y.C. Admin. Code § 8-101 *et seq.*

[4]   *See* Defendants' Statement of Undisputed Facts in Accordance with
Local Rule 56.1 ("Def. 56.1") ¶ 1.

[5]   *See id.* ¶ 3.

[6]   *See* Plaintiff's Response to Defendants' Statement of Undisputed
Facts ("Pl. 56.1") ¶ 3.

[7]   *See* Def. 56.1 ¶ 2.

superintendent position.  Defendants emphasize that superintendents must regularly perform hands-on maintenance work, including the "essential function" of "using and maintaining cleaning agents and paints, and supervising others using chemical cleaning agents and paints."[8]  Jernigan, however, disputes this characterization, and contends the position "encompassed a far greater scope of duties and responsibilities," primarily involving supervisory and administrative work, and hands-on tasks unrelated to chemical substances, such as fixing and changing locks, checking for and fixing leaky pipes, and installing smoke and carbon monoxide detectors.[9]

In March 2008, Jernigan took a short-term disability leave, during which time he underwent surgery for a total hip replacement.[10]  For the seven years preceding his disability leave, Jernigan's supervisor – and property manager at the Lakeview – was Cheryl Labelle.[11]  Jernigan had a strong collegial relationship with Labelle, as they "discussed . . . life and everything,"[12] including Jernigan's hip

---

[8]     *Id.* ¶¶ 4-5.

[9]     Pl. 56.1 ¶¶ 4-5.

[10]    *See id.* ¶ 7.

[11]    *See id.* ¶ 12.

[12]    Jernigan Deposition, Appendix C to Pl. 56.1 ("Jernigan Dep.") at 68, lines 6-11.

replacement, arthritis, and asthma problems.[13]  In July 2008, during his disability

leave, Stacey Berry replaced Labelle as resident manager.[14]  When Jernigan

returned to work as superintendent at Lakeview in September 2008, Berry became

his new direct supervisor.[15]

       On October 15, 2008, Berry assigned Jernigan to paint the gate

surrounding the Lakeview complex.[16]  Jernigan began painting that day and

continued the following day until it began raining in the afternoon, when painting

became impractical.[17]  On October 17, Jernigan did not paint because he felt

asthma-induced tightness in his chest and wanted to avoid noxious paint fumes, but

he did other work such as install lights and fix leaky pipes.[18]  That day, Berry

reprimanded Jernigan in writing for failure to follow her instruction to paint the

fence.[19]  On October 20, Jernigan presented Berry with a doctor's note stating that,

---

[13]     *See* Pl. 56.1 ¶ 15.

[14]     *See* Def. 56.1 ¶ 9.

[15]     *Id.* ¶¶ 8-9.

[16]     *See id.* at ¶ 10.

[17]     *See* Pl. 56.1 ¶ 12.

[18]     *See id.*

[19]     *See* Def. 56.1 ¶ 13.

"[b]ecause of severe asthma, Mr. Jernigan should not be exposed to chemicals."[20]

In a letter dated the following day, October 21, 2008, Berry notified Jernigan that

he was terminated.[21]   The letter, addressed to Jernigan, stated in full:

> You presented us with a letter from your doctor dated October 20, 2008 indicating that because of your asthma condition you cannot be exposed to any chemicals.
> This makes you less than 100% fit to perform your duties as superintendent.   Therefore, effective immediately you are hereby terminated.[22]

On October 23, 2008, plaintiff filed a grievance with his Union

alleging wrongful termination.[23]   Jernigan's Union representative contacted Berry

to resolve the complaint, and by letter dated October 27, 2008, Berry wrote to the

Union  representative:  "Lakeview Apartments is willing to re-hire Marty Jernigan

effective immediately.  Please contact me . . . to discuss."[24]  In a letter dated

October 30, 2008, and addressed directly to Jernigan, Berry wrote:

> Please be advised that on October 27, 2008, your union

---

[20]      *Id.* ¶ 14.

[21]      *See id.* ¶ 17.

[22]      10/21/08 Letter from Berry to Jernigan, Ex. D to Affidavit of Stacey Berry In Support of Defendants' Motion for Summary Judgment ("Berry Aff.").

[23]      *See* Affidavit of Frank Monaco In Support of Defendants' Motion for Summary Judgment ¶ 3.

[24]      10/27/08 Letter from Berry to Union, Ex. E to Berry Aff. ("10/27/08 Letter").

> representative was contacted regarding your layoff. . . . As
> discussed, you were to return to your position as Superintendent
> of Lakeview Apartments effective October 29, 2008, which you
> failed to do.
>
> It is imperative that you contact me . . . to discuss when and
> if you plan on returning to work.[25]

Jernigan contends he never received the October 30 letter, but he does

acknowledge that he was aware, through communication with his Union

representative, that Defendants were willing to rehire him.[26]  However, Jernigan

chose not to return to work because he believed Defendants' offer failed to address

his asthma.[27]

In June 2009, Jernigan applied for and received Social Security

Disability Insurance ("SSDI") based on asthma, insomnia, and a hip replacement.[28]

In his sworn SSDI application, Jernigan claimed that "difficulty breathing due to . .

. asthma" limited his ability to work.[29]  In response to the fill-in-the-blank question,

---

[25]   10/30/08 Letter from Berry to Jernigan, Ex. F to Berry Aff. ("10/30/08 Letter").

[26]   Pl. 56.1 ¶ 21.  Jernigan denies that he believed they were "unconditionally" willing to rehire him.  *See id.* ¶ 19.

[27]   *See id.* ¶ 20; Jernigan Dep. at 165, lines 18-20 (explaining why he rejected the offer, Jernigan stated, "my situation [i.e. asthma] that [Defendants] used to terminate me has not been addressed whatsoever [in the offer]").

[28]   Def. 56.1 ¶ 22.

[29]   SSDI Disability Report, Ex. F to Affidavit of Sal Meli, Defendants' counsel, In Support of Defendants' Motion for Summary Judgment ("Meli Aff."),

"When did you become *unable to work* because of your [condition]?," Jernigan listed October 15, 2008.[30]   Jernigan did not concede, however, that he was unable to perform any particular "essential functions" of a superintendent.[31]

## III.   LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[32]  "An issue of fact is genuine if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'  A fact is material if it 'might affect the outcome of the suit under the governing law.'"[33]  "[T]he burden of demonstrating that no material fact exists lies with the moving party . . . ."[34]  "When the burden of proof at trial would

---

Sec. 2 at 2.

[30]     *Id.* (emphasis in original).

[31]     *See* Affidavit of Plaintiff Marty V. Jernigan in Opposition to Defendants' Motion for Summary Judgment ("Jernigan Aff.") ¶ 21.

[32]     Fed. R. Civ. P. 56(c).

[33]     *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[34]     *Miner v. Clinton County*, 541 F.3d 464, 471 (2d Cir. 2008).  *Accord Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004).

fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence . . . on an essential element of the nonmovant's claim."[35]  In turn, to defeat a motion for summary judgment, the non-moving party must raise a genuine issue of material fact.  To do so, the non-moving party must do more than show that there is "'some metaphysical doubt as to the material facts,'"[36] and "'may not rely on conclusory allegations or unsubstantiated speculation.'"[37]  However, "'all that is required [from the non-moving party] is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial.'"[38]

      "In ruling on a motion for summary judgment, a court must resolve

---

[35]    *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008). *Accord In re September 11 Litig.*, 500 F. Supp. 2d 356, 361 (S.D.N.Y. 2007) ("Where the nonmoving party bears the burden of proof at trial, the burden on the moving party may be discharged by showing – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case.") (quotation marks and citations omitted).

[36]    *Higazy v. Templeton*, 505 F.3d 161, 169 (2d Cir. 2007) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).

[37]    *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (quoting *Fujitsu Ltd. v. Federal Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001)).

[38]    *Kessler v. Westchester County Dep't of Soc. Servs.*, 461 F.3d 199, 206 (2d Cir. 2006) (quoting *Anderson*, 477 U.S. at 248-49).

all ambiguities and draw all factual inferences in favor of the nonmoving party."[39]

However, "[i]t is a settled rule that '[c]redibility assessments, choices between

conflicting versions of the events, and the weighing of evidence are matters for the

jury, not for the court on a motion for summary judgment.'"[40]   Summary judgment

is therefore "appropriate only if there is no genuine issue of material fact and the

moving party is entitled to judgment as a matter of law."[41]

## IV.   APPLICABLE LAW

The ADA creates a private right of action for disability-based

employment discrimination.[42]   ADA discrimination claims are subject to the

familiar three-step burden-shifting framework established in *McDonnell Douglas*

*Corp. v. Green*.[43]   To establish a prima facie case of discrimination under the ADA,

a plaintiff must show that: "1) he was an 'individual who has a disability' within

the meaning of the statute; 2) the employer had notice of his disability; 3) he could

perform the essential functions of the job with reasonable accommodation; and 4)

---

[39]     *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006) (citing
*Anderson*, 477 U.S. at 242, 255).

[40]     *Id.* (quoting *Fischl v. Armitage*, 128 F.3d 50, 55 (2d Cir. 1997)).

[41]     *Pyke v. Cuomo*, 567 F.3d 74, 76 (2d Cir. 2009).   *Accord Sledge v.
Kooi*, 564 F.3d 105, 108 (2d Cir. 2009).

[42]     *See* 42 U.S.C. § 12112(a).

[43]     411 U.S. 792 (1973).

the employer refused to make such accommodation."[44]  In this Circuit, a disability-based discrimination claim under the NYSHRL and NYCHRL involve the "same elements" as an ADA claim.[45]  Thus, analysis under the ADA applies equally to a plaintiff's New York State and City claims for disability-based discrimination.

## V.  DISCUSSION

For the purposes of this motion, Defendants concede or do not contest that (i) Jernigan has a disability within the meaning of the statutes, (ii) the Defendants had notice of his disability, and (iii) the Defendants failed to accommodate plaintiff's disability by terminating him.[46]  Thus, the disposition of this motion hinges on whether Jernigan can show that he could "perform the essential functions of his job, with or without reasonable accommodation."[47]

### A.  Jernigan Is a Qualified Individual

#### 1.  Jernigan Is Not Estopped by His SSDI Application

---

[44]  *DeRosa v. National Envelope Corp.*, 595 F.3d 99, 102 (2d Cir. 2010) (quoting *Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 332 (2d Cir. 2000)).

[45]  *Kinneary v. City of New York*, 601 F.3d 151, 158 (2d Cir. 2010) (citing *Shannon v. New York City Transit Auth.*, 332 F.3d 95, 103-04 (2d Cir. 2003)).

[46]  *See* Defendants' Memorandum of Law in Support of Their Motion for Summary Judgment at 5.

[47]  *Capobianco v. City of New York*, 422 F.3d 47, 56 (2d Cir. 2005).

Defendants argue that Jernigan's ADA claim must be dismissed because he admitted in his SSDI application that he was "unable to work" due to his asthma as of October 15, 2008, and he thus admitted that he was not a qualified individual – capable of performing essential functions of his job – under the ADA. While it is true that "[j]udicial estoppel applies to sworn statements made to administrative agencies such as the Social Security Administration[,]"[48] the Supreme Court has held that "pursuit, and receipt, of SSDI benefits does not automatically estop the recipient from pursuing an ADA claim."[49]

> Nor does the law erect a strong presumption against the recipient's success under the ADA. Nonetheless, an ADA plaintiff cannot simply ignore her SSDI contention that she was too disabled to work. To survive a defendant's motion for summary judgment, she must explain why that SSDI contention is consistent with her ADA claim that she could "perform the essential functions" of her previous job, at least with "reasonable accommodation."[50]

In determining whether statements made in the SSDI context are consistent with those made in the ADA context, "the court must undertake a fact-specific analysis of whether the claims made in the SSDI application directly contradict the

---

[48]    *DeRosa*, 595 F.3d at 103 (citing *Mitchell v. Washingtonville Cent. Sch. Dist.*, 190 F.3d 1, 6 (2d Cir. 1999)).

[49]    *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 797 (1999).

[50]    *Id.* at 797-98.

allegations made in the ADA context."[51]  Only "directly conflicting statements about purely factual matters"[52] made in an SSDI application may estop a plaintiff in the ADA context.[53]  Ultimately, to survive summary judgment, a plaintiff's explanation of inconsistent statements "must be sufficient to warrant a reasonable juror's concluding that, assuming the truth of, or the plaintiff's good-faith belief in, the earlier statement, the plaintiff could nonetheless 'perform the essential functions' of her job, with or without 'reasonable accommodation.'"[54]

Although Jernigan admitted that he was "unable to work" for the purposes of an SSDI application, that statement does not, in itself, estop him from claiming he was capable of performing essential job functions under the ADA, because unlike the Social Security Act, the ADA contemplates reasonable

---

[51]  *Parker*, 204 F.3d at 333.

[52]  *Cleveland*, 526 U.S. at 802.

[53]  *See also DeRosa*, 595 F.3d at 104 ("[A] simple averment that one is disabled for the purposes of an SSDI application does not preclude the argument that one could, with reasonable accommodation, be gainfully employed.  The statement 'I am disabled' on an SSDI application should generally be taken as a statement that 'I am disabled for the purposes of the Social Security Act.'  The Social Security Act does not concern itself with reasonable accommodation.").  *Cf. Parker*, 204 F.3d at 333 ("In particular, summary judgment may be appropriate under *Cleveland* where the SSDI and ADA claims 'involve directly conflicting statements about purely factual matters.'") (quoting *Cleveland*, 526 U.S. at 1601).

[54]  *Cleveland*, 526 U.S. at 807.

accommodation.  Thus, Jernigan's ADA claim is not entirely precluded, but he is bound by the purely factual statements made in the SSDI application, including that he had a hip replacement, suffered from asthma and insomnia, and that his difficulty breathing limited his ability to do some aspects of his job.  These statements are, however, entirely consistent with Jernigan's statements in this action for relief under the ADA, and do not preclude the possibility that Jernigan could have – with or without reasonable accommodation – performed all of the essential functions of his position.

### 2.   The Essential Functions of Jernigan's Position Are a Disputed Issue of Material Fact

Defendants contend that, even if Jernigan is not entirely estopped from bringing an ADA action, under *Cleveland v. Policy Management Systems, Corp.* he must provide a "sufficient explanation" as to why he was both "unable to work" under the SSA and able to "perform the essential functions" of his job under the ADA.  While Jernigan does not expressly address this legal issue, he disputes a more basic factual question – namely, the "essential functions" of his former position as superintendent at Lakeview.

As set forth in the EEOC regulations, factors relevant to determining whether a job function is essential include:

the employer's judgment, written job descriptions, the amount of

13

time spent on the job performing the function, the consequences of not requiring the plaintiff to perform the function, mention of the function in any collective bargaining agreement, the work experience of past employees in the job, and the work experience of current employees in similar jobs.[55]

Neither party has presented undisputed evidence setting forth the "fundamental job duties"[56] of Jernigan's superintendent position at Lakeview. Berry, speaking as Jernigan's employer, stated that, "[a]s part of a superintendent's essential functions, they must be able to lift heavy objects, use cleaning agents and paint and repair and maintain the building systems."[57]   Defendants also cite various cleaning tasks included in the "Work Schedule Guide" under the Union's Collective Bargaining Agreement ("CBA") with the Bronx Realty Advisory Board, Inc., which purports to set forth the duties of covered employees.[58]   "However, 'the considerations set out in [the] regulation are fact-intensive.  Usually no one listed

---

[55]     *Price v. City of New York*, 264 Fed. Appx. 66, 68-69 (2d Cir. 2008) (citing *Stone v. City of Mount Vernon*, 118 F.3d 92, 97 (2d Cir. 1997) (quoting 29 C.F.R. § 1630.2(n))).

[56]     29 C.F.R. § 1630.2(n)(1).

[57]     Berry Aff. ¶ 4.

[58]     *See* Work Schedule Guide, Ex. G to Meli Aff.  However, the Work Schedule Guide appears to cover all employees covered by the CBA, including handymen, porters, etc.  Thus, the inclusion of cleaning and maintenance tasks in the Guide does not clearly signify that superintendents are required to perform such tasks.

14

factor will be dispositive[.]"[59]  Neither party has provided a formal job description,

nor has either party addressed the frequency or duration of exposure to chemical

fumes as a superintendent, the consequences of not requiring a superintendent to

perform functions that involve chemical-fume exposure, or the work experience of

current or past superintendents with regard to chemical-fume exposure.  While

Jernigan acknowledges that he was exposed to chemicals at work,[60] he denies that

any of the essential functions of his job required exposure to chemicals.  Indeed, all

of the responsibilities specifically imputed to "superintendents" in the Work

Schedule Guide concern administrative or supervisory tasks.[61]  Thus, Jernigan

argues, assuming, *arguendo,* that he "could not" be exposed to chemical fumes, he

could perform all of the essential functions of his job, even without reasonable

accommodation.

       Viewing the facts in the light most favorable to the non-moving party

---

[59]     *Price*, 264 Fed. Appx. at 69 (quoting *Stone*, 118 F.3d at 97).

[60]     *See* Jernigan Dep. at 38, lines 11-12; 5/29/09 Doctor's Letter, Ex. H to Meli Aff. (stating that "exposure to chemicals and cleaning solutions at work exacerbate his symptoms and should be strictly avoided").

[61]     *See* Work Schedule Guide at 1 ("Superintendent to keep record of staff's personal days and vacation days[,] . . . to post all government required signs[,] . . . to distribute all government mandatory notices[,] . . . [and] to post whereabouts in building[.]  Superintendents will comply with all government requirements / regulations . . . ").

and drawing all reasonable inferences in his favor, I cannot say as a matter of law

that essential functions of Jernigan's position included tasks such as cleaning and

painting that required chemical-fume exposure. Thus, it is reasonable to infer that

Jernigan was a qualified individual – able to perform all of his position's essential

functions – for purposes of making an ADA claim.

### 3. Whether Jernigan Could Perform Tasks Requiring Chemical Exposure With Reasonable Accommodation Is a Disputed Issue of Material Fact

In arguing that Jernigan was incapable of performing essential

functions of his job, Defendants rely heavily on Jernigan's October 20, 2008

doctor's note, which states that "[b]ecause of severe asthma, Mr. Jernigan should

not be exposed to chemicals."[62] Defendants declare, in a conclusory fashion, that

"the doctor's note made clear that plaintiff could not be exposed to chemicals, and

therefore, he could not perform essential functions of his job."[63] However, a

reasonable fact finder could interpret Jernigan's doctor's note as a request to

accommodate his asthma, rather than a declaration of incapacity. Once an

employee meets the initial burden of requesting accommodation for a disability,

the employer *must* engage in the "interactive process" envisioned by the ADA, "by

---

[62]     Def. 56.1 ¶ 14.

[63]     *Id.* ¶ 17.

16

which employer[] and employee[] work together to assess whether an employee's disability can be reasonably accommodated."[64]   But the day after Jernigan gave notice of his asthma and his doctor's prescription to avoid chemicals, Defendants perfunctorily terminated his employment without first determining that reasonable accommodation would be impractical.[65]   Nor have Defendants shown that Jernigan's asthma could not be reasonably accommodated.  Thus, even if Jernigan's essential job functions required chemical exposure, Defendants have failed to show that he could not otherwise perform such functions with reasonable accommodation.

## B.   Defendants Made an Unconditional Offer of Reinstatement

It is settled law that a victim of employment discrimination is required to mitigate his lost wages by "us[ing] reasonable diligence in finding other suitable employment."[66]   Thus, "[w]hen an employer makes an unconditional offer to reinstate an employee terminated as a result of discrimination, the employee's

---

[64]   *Jackan v. New York State Dep't of Labor*, 205 F.3d 562, 566 (2d Cir. 2000).

[65]   Indeed, concerning Jernigan's complaint, an EEOC investigator ruled, "[Defendants'] '100% fit' policy does not allow accommodation for individuals with disabilities[.]"  EEOC Determination, Ex. 3 to Jernigan Aff.

[66]   *Padilla v. Metro-North Commuter R.R.*, 92 F.3d 117, 125 (2d Cir. 1996) (quotation marks and citations omitted).

rejection of that offer forecloses any claim for future front pay and tolls the continuing accrual of back-pay liability[.]"[67]  "To toll the accrual of backpay as of the date of the employee's rejection, an employer need only offer reinstatement to 'a job substantially equivalent to the one he was denied.'"[68] "Whether the employer made an unconditional offer of reinstatement, and whether the employee rejected that offer, are questions of fact to be determined by the district court."[69]

Even accepting Jernigan's assertion that he did not receive the October 30, 2008 letter – which was addressed to him and more clearly states an offer "to return to [his] position as Superintendent of Lakeview"[70] – a reasonable juror would have to find that Defendants presented him with an unconditional offer of reinstatement on October 27, 2008.  Defendants' first offer, in a letter to Jernigan's Union representative on October 27, stated "Lakeview Apartments is

---

[67]    *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 908 (2d Cir. 1997) (citing *Ford Motor Co. v. EEOC*, 458 U.S. 219, 234 (1982) (holding that an employer charged with discrimination in hiring can toll the continuing accrual of backpay liability under § 706(g) of Title VII by unconditionally offering the claimant the job previously denied)).

[68]    *Robles v. Cox & Co., Inc.*, 154 F. Supp. 2d 795, 807 (S.D.N.Y. 2001) (quoting *Lightfoot*, 110 F.3d at 908).

[69]    *Clarke v. Frank*, 960 F.2d 1146, 1151 (2d Cir. 1992) (citing *Pierce v. F.R. Tripler & Co.*, 955 F.2d 820, 830 (2d Cir. 1992).

[70]    10/30/08 Letter.

18

willing to re-hire Marty Jernigan effective immediately.  Please contact me . . . to discuss."[71]  Jernigan argues this offer was not unambiguously unconditional, characterizing it as no more than "an offer to discuss terms subject to negotiations with union personnel[.]"[72]  But Jernigan's interpretation strays from the plain language of the letter.  Although it does not expressly state an "unconditional offer" – at least not in those terms – the letter sets forth no conditions and says, quite clearly, that Defendants were "willing to rehire [him] *effective immediately*."[73]  That the reinstatement would be immediate implies the offer was unconditional.  Moreover, as the rule in *Ford Motor Co. v. EEOC* is interpreted in this Circuit, "an offer of reinstatement is understood to be unconditional where the discharged employee is not required to compromise his claims against the defendant as a prerequisite to returning to work."[74]  Here, Defendants' October 27

---

[71]    10/27/08 Letter.

[72]    *See* Plaintiff's Memorandum of Law in Opposition to the Defendants' Motion for Summary Judgment at 6.

[73]    10/27/08 Letter (emphasis added).

[74]    *Miano v. AC&R Advertising, Inc.*, 875 F. Supp. 204, 221 (S.D.N.Y. 1995) (citing *Ford Motor Co.* 458 U.S. at 232).  *Accord Lightfoot*, 110 F.3d at 909 ("[b]y definition, an unconditional offer may not require the employee to abandon or modify his suit"); *Eastmer v. Williamsville Cent. School Dist.*, 977 F. Supp. 207, 216 (W.D.N.Y. 1997) ("An unconditional offer is one in which the plaintiff is not required to give up any claims for damages, including damages for back pay that accrued before the offer was made, in exchange for the offer.").

offer was made only six days after his termination and well before Jernigan had filed any claims for damages.

Jernigan has cited nothing about the offer of reinstatement, or his understanding of the offer as made through his Union representative, that would permit a reasonable juror to infer it was not unambiguously unconditional. Indeed, Jernigan answered "Yes" when asked in his deposition, "Were you told by the Union [representative] that you were still *being offered your job back* [in the days following October 27th]?"[75] Jernigan's sworn testimony acknowledges that Defendants were unconditionally offering him the superintendent position. Thus, Jernigan has failed to raise a genuine issue of material fact as to whether the offer of reinstatement was unconditional. Because he declined an unconditional offer of reinstatement, Jernigan may not recover damages for front pay and his damages for back pay are tolled as of the date of his refusal on October 27, 2008. Nonetheless, Jernigan may still seek other types of damages, such as punitive damages.

## VI.   CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is granted in part and denied in part. The Clerk of Court is directed to close this motion (Docket # 22). A conference is scheduled for August 18, 2011 at 4:00 PM.

---

[75]   Jernigan Dep. at 165, lines 8-10 (emphasis added).

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated: New York, New York
      July 29, 2011

**- Appearances -**

**For Plaintiff:**

Elliott B. Leibowitz, Esq.
401 Broadway, Suite 1502
New York, NY 10013
(212) 925-8588


**For Defendants:**

Sal Meli, Esq.
Gilbride, Tusa, Last & Spellane LLC
708 Third Avenue, 26th Flr.
New York, NY 10017
(212) 692-9666